**Jimmie FRYE, Claimant/Appellant,**

v.

**VIACOM, INC., Employer/Respondent.**

**No. 69127.**

Missouri Court of Appeals,
Eastern District,
Division One.

July 16, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 15, 1996.

Application to Transfer Denied
Sept. 17, 1996.

Frank J. Niesen, Jr., St. Louis, for appellant.

Ernie Brasier, Law Offices of Mark R. Rudoff, St. Louis, for respondent.

REINHARD, Presiding Judge.

Claimant appeals the denial of his claim for workers' compensation benefits by the Labor and Industrial Relations Commission (Commission). We reverse and remand.

At the hearing for compensation held on August 25, 1994, claimant and employer submitted an "Agreed Statement of Facts" and concurred that the sole issue was whether claimant's "injury arose out of and in the course of employment." The stipulated facts reveal that employer offered a parking program to its employees in Stadium Garage East, approximately two blocks from employer's building. Employer negotiated with Central.Parking System (Central), owner of the garage, for its employees to park in Stadium Garage East at a discounted bulk rate. The agreement between Central and employer included the following provisions:

> The following confirms the understanding between Central Parking System of St. Louis, Inc. ("Central") and CBS on behalf of KMOX–TV ("Station") regarding parking for Station personnel ("employees") in the Stadium East Parking Garage (the "Garage"). Specifically, effective October 1, 1985:
>
> 1. Station will be responsible for the collection of funds from and distribution of parking cards to employees utilizing the Garage. Station will provide Central's standard license agreement to employees desiring the use of the Garage. After an individual employee has signed such agreement, Station shall then issue a parking card to such employee and request in writing that Central activate the card. Station shall also forward a copy of the license agreement signed by such employee to Central. Upon execution by Central, a copy of the fully-executed license agreement will be mailed by Central to the employee.
>
> 2. Station will attempt to ensure that Central is provided with at least thirty (30) days prior notice of cancellation of any license agreement executed pursuant to paragraph 1 above. Station shall endeavor to collect all fees after such cancellation in accordance with the terms of the standard license agreement. However, Station shall, in the event that it is unable to collect all such fees, be obligated to make payment to Central only in accordance with the following:
>
> a. If card is cancelled between the 1st and 14th day of the current month, Station owes fees through the 15th day of the following month. .
>
> b. If card is cancelled between the 15th day and the end of the current month, Station owes fees through the end of the following month.

Notification of cancellation shall be effective when received by Central, which notification can be provided by telephone. However, when such notification is provided by telephone, a written follow-up is to be provided by Station.

3. Station will be responsible for paying the $10 replacement fee for any lost cardkey.

4. It is understood that the warranties and indemnities contained in Central's license agreement, including any understanding regarding loss or damage to vehicles, will be strictly between Central and the employee/licensee as neither Station or CBS Inc. shall be deemed a party to such license agreement. Station may terminate its duties regarding the collection of funds from and the distribution of parking cards to employees on thirty (30) days prior written notice.

The stipulated facts further explain the parking agreement:

With regard to the parking, the parties stipulate that Viacom, Inc. provides parking for its executive employees. That parking is located within the garage of the Viacom Building located at One Memorial Drive. With regard to the other employees, including [claimant], the payment for parking is deducted from the employee's payroll. The employees, including [claimant], sign a statement that authorize[s] Viacom, Inc. to deduct from their pay the amount of the parking contract with Stadium Garage East. Viacom, Inc. remits the payment deducted from the employee's pay to Stadium Garage East. Viacom negotiates a bulk rate discounted parking for its employees at Stadium Garage East, which is close to Viacom's KMOV–TV offices. Many Viacom employees park there. This arrangement guarantees parking for the Viacom employees so that they always have a place to park, regardless of other events going on. The TV Station began doing this years ago when the parking lot was raising parking rates and was not willing to guarantee space for the employees without the TV Station's intervention. The Agreement guarantees employees access to parking at all times at a location close to their employment. Employees are not forced to park at Stadium Garage East.

Claimant chose to park in Stadium Garage East, approximately two blocks from employer's offices, and authorized employer to deduct the parking fee from his paycheck. The "Agreed Statement of Facts" provides an account of the accident:

On [January 29, 1991], [claimant] had parked his automobile in the Stadium Garage East, a public parking lot which is utilized by many Viacom employees under an arrangement made by their employer.... [Claimant] was walking to work. The parking garage is located at Fourth and Chestnut, across from what was then called the Clarion Hotel. [Claimant] walked north on the public sidewalk on Fourth [S]treet. He crossed Chestnut, and fell in front of the Fur Exchange Building, just north of the entrance to the Post Office on Fourth Street. This is the normal walk to work from the garage for [claimant] a[s] it is for many of Channel 4's employees.

[Claimant] fell when he stepped on a grating in the sidewalk that was covered with ice. His feet went out from under him and he landed on his tailbone and his right wrist. He was about half a city block from the entrance to Viacom's building. He was carried by a co-employee he was walking with to and inside Channel 4's building.

■ On appeal, claimant contends that the Commission erred in denying his claim for workers' compensation because employer had extended its premises to the place of his accident.

■ In a workers' compensation case, we review the whole record, including legitimate inferences to be drawn therefrom, in the light most favorable to the award of the Commission. *Kramer v. Bill's Marine, Ltd.*, 897 S.W.2d 213, 215 (Mo.App. E.D.1995). This court may modify, reverse, remand for rehearing, or set aside an award or decision of the Commission only if the Commission's actions were unauthorized by law, in excess of its authority, fraudulent, unsupported by

the facts as found by the Commission, or unsupported by competent evidence on the whole record. *Id.* Decisions of the Commission in workers' compensation proceedings that are clearly interpretation or application of law, as distinguished from determination of fact, are not binding upon the reviewing court and fall within the court's province of review and correction. *West v. Posten Const. Co.,* 804 S.W.2d 743, 744 (Mo. banc 1991).

The parties cite Larson[1] and several cases supporting their positions, but we believe the issue before us is controlled by the recent Missouri Supreme Court decision of *Cox v. Tyson Foods, Inc.,* 920 S.W.2d 534 (Mo. banc 1996), which was rendered subsequent to the oral arguments in this case.

In *Cox,* the claimant testified that he slipped and fell while "walking along the usual or customary route from [a] parking lot to the plant." *Id.* at 535. The parking lot was located "across 'old highway 60.'" *Id.* Most freezer and dock employees of the employer parked in the lot, known as the "south lot." *Id.* at 535. The employer did not own the south lot, but it "was designated for Tyson employee parking," apparently with the permission of the lot's owner. *Id.* at 535.

The Commission concluded that the claimant's injuries were not compensable because the accident did not arise out of or in the course of employment. *Id.* at 535. The Missouri Supreme Court reversed, and Judge White, speaking for the court, explained:

> To be compensable under worker's compensation, employee's injury must be due to an accident arising out of and in the course of employment. § 287.120.1, RSMo 1994. Generally, accidents occurring on the trip to or from work are not deemed to arise out of and in the course of employment. *Person v. Scullin Steel Co.,* 523 S.W.2d 801, 806 (Mo. banc 1975). An exception to this going to and coming from work rule allows recovery of worker's compensation benefits if:
>
> (a) the injury-producing accident occurs on premises which are owned or controlled by the employer, or on premises which are not actually owned or controlled by the employer but which have been so appropriated by the employer or so situate, designed and used by the employer and his employees incidental to their work as to make them, for all practicable intents and purposes, a part and parcel of the employer's premises and operation; and
>
> (b) if that portion of such premises is a part of the customary, expressly or impliedly approved, permitted, usual and acceptable route or means employed by workmen to get to and depart from their places of labor and is being used for such purpose at the time of the injury.

*Kunce v. Junge Baking Co.,* 432 S.W.2d 602, 607 (Mo.App.1968). Injuries incurred on employer's premises along the accepted route to or from work arise out of and in the course of employment just as much as do injuries occurring during the performance of work. *State ex rel. McDonnell Douglas Corp. v. Luten,* 679 S.W.2d 278, 280 (Mo. banc 1984).

This Court has held property sufficiently appropriated to be considered an extension of employer's premises when it is used by employees as a route of access to employer's premises with employer's knowledge and acquiescence. *Id.* The record reveals Tyson's management told employees they could park in the south lot; it was a "designated" lot. A significant portion of Tyson's employees customarily parked in the south lot. The south lot was closer than the Tyson-owned north lot was to the freezer and dock working areas. Tyson knew and acquiesced to the use of the south lot as a means of access to the plant by employees.

These same facts bring the present case under the following portion of the *Kunce* test: "or on premises which are *not actually owned or controlled by the employer* but which have been so appropriated by the employer or *so situate, designed and used* by the employer and his employees incidental to their work as to make them,

---

1. A. Larson and L. Larson, *The Law of Workmen's Compensation,* §§ 15.14(b) and 15.42(a) (1995).

for all practicable intents and purposes, a part and parcel of the employer's premises and operation." *Kunce,* 432 S.W.2d at 607.

The south lot was situated so near the dock and freezer work areas, employees working in those portions of the plant found it more convenient to park there than in the north lot. Tyson designated the south lot as a place for employees to park. Inviting employees to park there comports with this definition of design: "a particular purpose held in view by an individual or group: a planned intention." *Webster's Third New International Dictionary Unabridged* 611. If Tyson did not intend or plan for employees to use the south lot for parking, no invitation would have been given. Tyson employees put the south lot to regular use. Most of the freezer and dock employees parked in the south lot daily. The south lot was "so situate, designed and used by the employer and his employees" as to make it, "for all practicable intents and purposes, a part and parcel of the employer's premises and operation." *Kunce,* 432 S.W.2d at 607. Cox, therefore, meets the first prong of the *Kunce* test, *supra,* for exception to the going to and coming from work rule.

The second portion of the *Kunce* test is easily established. Nothing in the record contradicts Cox's testimony he fell while on the customary way back to work. The exception to the going to and coming from work rule applies; the injury arose out of and in the course of employment.

Respondent Tyson argues an employer does not appropriate premises without exerting control over the extended premises; employers need to have taken some action making its liability for accidents on those premises foreseeable. Foreseeable liability in the present case derives from an express invitation for employees to park there, Tyson's knowing acquiescence to regular use of the lot by employees, and the lot's location making it the more practical lot for use by some of Tyson's employ-

ees. Furthermore, the evidence is not devoid of Tyson's control of the south lot. Tyson's witnesses and the injury report indicated parking on the south lot was permissive. Although the record is silent as to how this permission was obtained, its existence implies some control by Tyson of the south lot.

(Emphasis in original). *Cox,* 920 S.W.2d at 535–36.

We note that the facts of *Cox* are somewhat similar to the facts before us in several ways. First, both Cox and claimant were injured while walking to work from a parking lot. The opinion states that the injury occurred "en route to Tyson's from [the] parking lot" and "along the usual or customary route from the parking lot to the plant." *Cox,* at 535.[2] The accident here occurred within the usual route taken by claimant from the parking garage to employer's offices.

Second, neither the south lot in *Cox* nor Stadium Garage East was adjacent to the property of the respective employers. Rather, in both cases, the employees had to cross a highway or street in order to reach their places of work.

Third, both parking lots were not owned by the employers. The *Cox* opinion clearly states that the "south lot" was not owned by Tyson, and here, the parking garage was owned by Central Parking Systems, not employer.

Finally, both employers had permission from the owners of the parking facilities for their employees to park in the lots. In *Cox,* evidence of permission, which was central to the concurring opinion of Judge Limbaugh, was gleaned from witnesses and the injury report. *Id.* at 536. Here, the written agreement between employer and Central Parking Systems constitutes clear evidence of permission.

The primary distinction between the two cases is the type of parking provided by the

---

**2.** It is arguable that the location of the accident in *Cox* is in dispute based upon Tyson's injury report, quoted in the opinion, which states that the accident occurred "on Deicor Lab. parking lot whom [sic] give Tyson employees permission to park." *Cox,* at 535. However, our analysis of *Cox* leads us to conclude that the opinion is based upon the premise that the accident occurred between Tyson's and the parking lot.

employers. Stadium Garage East is a public parking garage and claimant paid for his own parking, albeit at the discounted rate provided through employer's parking program. In contrast, the *Cox* opinion does not indicate that the "south lot" was open to the general public or that Tyson employees paid for parking privileges. In urban areas, such as downtown St. Louis, the form of the program, non-ownership of the parking facility, may differ from programs in less-populated areas, where employers often own or freely use nearby parking lots. However, the substance of the programs, providing safe and convenient parking for employees, is the same. To allow form to control substance and deny compensation to employees who participate in employer-designed parking programs in public parking garages would be unjust.

Another distinction between *Cox* and the case before us is the time of the injury. Cox was injured while returning from a paid break, but claimant fell while walking to employer's offices to begin work. However, *Cox* clearly states that the holding is not limited to employees who are injured while on a break. "The fact Cox was returning from a brief, paid, authorized break does not make his injury less incidental to employment than if he fell on employer's extended premises while on the way to work at the start of his shift." *Id.* at 537.

Here, we first must determine if Stadium Garage East had been so appropriated by employer or so situate, designed, and used by employer and its employees incidental to their work as to make it, for all practical intents and purposes, a part and parcel of employer's premises and operation. If so, then claimant's injury occurring while walking to work arose out of and in the course of employment just as if he had been injured during the performance of work. *See id.* at 535.

Clearly, Stadium Garage East was so situate as to make it part of employer's premises. The garage was located merely two blocks from employer's building, certainly "situate" in the context of downtown St. Louis. Indeed, employer stipulated that the parking program "guarantee[d] employees access to parking at all times at a location close to their employment."

Additionally, employer designed for the parking lot to be part of its premises and daily operation by creating the parking program, in which it played an active role. Employer distributed parking cards, collected parking fees, paid the replacement fee for lost parking cards, and guaranteed payment of the balance of cancelled permits. Moreover, employer benefitted from the program because it was assured that is workforce had regular and convenient access to its offices, regardless of downtown events. The discounted parking rate also made employer more attractive to potential employees, and the proximity of the garage to employer's building promoted the safety of its workers, who had to walk merely two blocks to reach employer's building. These factors indicate that Stadium Garage East was designed to be part of employer's premises and operation.

Finally, the stipulated facts reveal that the parking garage was, in fact, used as part of employer's premises: "[Stadium Garage East] is utilized by many Viacom employees under an arrangement made by their employer...." In contrast to *Cox*, employer not only obtained permission from Central and acquiesced to use of the garage by its employees but also actively offered assistance in using the lot through its parking program. Thus, we conclude that the garage was so situate, designed, and used by employer and its employees incidental to their work as to make it, for all practical intents and purposes, a part and parcel of employer's premises and operation.

The facts also fulfill the second prong of the test, which requires the injury to occur within the customary route taken by the employees in going to and coming from work. The parties stipulated that the location of the accident was within "the normal walk to work from the garage for [claimant], a[s] it is for many of [employer's] employees."

As in *Cox*, employer's liability was foreseeable, deriving from its active intervention to ensure guaranteed parking for its employees in a garage located near employer's offices.

Moreover, employer's involvement in the employees' parking situation more than satisfies the element of control, which, though not essential to the result, was implied in *Cox*.[3] Thus, we conclude that the exception to the going to and coming from work rule applies; the injury arose out of and in the course of employment.

As the facts before us satisfy both prongs of the test set forth in *Cox*, we reverse the decision of the Commission and remand the cause for further proceedings.

Reversed and remanded.

DOWD, J., concurs.

GRIMM, J., dissents in separate opinion.

GRIMM, Judge, dissenting.

I respectfully dissent. Contrary to the majority's belief, this case is not controlled by *Cox v. Tyson Foods, Inc.*, 920 S.W.2d 534 (Mo. banc 1996). Rather, the majority's holding results in a substantial expansion of the extended premises doctrine relied on in *Cox*.

### I.

In *Cox*, the employee had arrived at his employer's premises and begun his work. Apparently after working several hours, he received a paid fifteen-minute break. *Id.* at 535. During that paid break, he left the employer's premises. En route back to work from a parking lot across the highway, Cox fell and sustained an injury *. *Id.* In other words, employee was on a paid break and fell on his employer's extended premises.

The facts before us are quite different. Here, employee had not yet arrived at his place of employment to begin work. Rather, he was on his way to work.

Employee parked his car in a privately-owned public parking garage across the street from Busch Stadium. The garage is located approximately two blocks from employee's place of employment. Employer does not own, manage, lease, or otherwise operate the parking garage.

After crossing the street from the parking garage, employee proceeded towards his place of employment. He walked on the public sidewalk. When he was about half a city block from the entrance to his employer's building, he stepped on an ice-covered grating in the sidewalk and fell.

### II.

The facts before us are also substantially different from those in *Kunce v. Junge Baking Co.*, 432 S.W.2d 602 (Mo.App. S.D.1968), on which the *Cox* opinion relies. In *Kunce*, the employee arrived at work at 4 a.m. to work a 9 or 9½ hour shift. *Id.* at 604. Under "company policy," the employees remained "on the clock" continuously until the end of their shifts. *Id.* at 605. The employees were not limited as to where they could go during a break. *Id.*

Kunce took a break around 10 a.m. and left the premises to purchase cigarettes. *Id.* While returning, he sustained injury when he tripped on a cement runway outside employer's building. The Commission found the accident occurred on employer-owned premises and awarded benefits. *Id.* at 605.

Under the procedure then in existence, the appeal first went to the circuit court. The circuit court reversed. Although it agreed that the accident happened on the employer's property, it held that Kunce's presence on

---

**3.** The result of this case is not contrary to the concurring opinion of Judge Limbaugh in *Cox*, which we set forth in full:

> I concur in the outcome of this case and also in the rationale, except to the extent that it can be read to allow recovery on no more proof than an employer's "invitation" to its employees to park in a designated off-premises lot. Crucial to employee's recovery, in my view, is the additional fact that Tyson Foods apparently obtained permission from the owners of the lot before suggesting that the employees may park there. Only in this way was the lot "so ap-

propriated" by Tyson or "so situate, designed and used" by Tyson and its employees that it became an extension of the premises.
*Cox*, 920 S.W.2d at 537.

\* I am unable to ascertain from the *Cox* opinion the exact location where Cox fell. The opinion states, "The fall occurred en route to [employer's facility] from a parking lot across 'old highway 60' to the south of the Marionville facility where Cox worked." However, the opinion also quotes from employer's injury report that the accident occurred "on [the adjacent] parking lot" where employees were permitted to park. *Id.* at 535.

the runway "was not incident to his employment and was not necessary to any phase of his employment." *Id.* The court of appeals agreed and affirmed.

Notably, the *Kunce* opinion, cited in *Cox,* discusses the "going to and coming from work rule" in the context of a paid-break case. *Cox* at 535. *Cox* discusses that rule in the same context. The majority opinion ignores that context.

### III.

The *Cox* opinion also refers to *State ex rel. McDonnell Douglas Corp. v. Luten,* 679 S.W.2d 278 (Mo.banc 1984). In *Luten,* the employee was struck by a car while crossing a road to get to a bus stop. The employer built and maintained the bus stop shelter on the far side of the road. The crosswalk to the shelter was marked by lines painted and maintained by the employer. It was illuminated by a lightpole employer erected. The employer maintained the surface of the road, although St. Louis County owned the roadway. *Id.* at 279.

The bus which served the shelter was driven by another employee. Previously, the bus picked up employees "within the compound," but a few months before the accident the employer built the shelter and rerouted the employees to it. *Id.* It is in this context that the *Luten* court said, "Property is sufficiently 'appropriated' to make it a part of the employer's extended premises if it is used by employees as a route of access to the employer's premises, and such use is known to and acquiesced in by the employer." *Id.* at 280; *see also, Cox* at 535.

In contrast to the strong facts of appropriation in *Luten,* the majority opinion finds appropriation based on a contract with the garage owner whereby employer (1) distributed parking cards, (2) collected parking fees, and (3) paid replacement fees for lost parking cards. *Frye,* slip op. at 6–7. Those facts do not constitute "appropriation" as that term is customarily used.

### IV.

Nor is the majority's holding supported by commentators. Professor Larson recognizes a difference exists between employer-owned or maintained parking lots and privately-owned lots. He states that since "a parking lot *owned or maintained by the employer* is treated by most courts as part of the premises, most courts, but by no means all, hold that an injury in a public street or other off-premises place between the plant and the parking lot is in the course of employment, being on a necessary route between the two portions of the premises." (Emphasis added). A. Larson and L. Larson, *The Law of Workmen's Compensation* § 15.14(b) (1995).

However, he notes that a different rule applies to privately-owned lots. If "the parking lot is a purely private one, the principle of passage between two parts of the premises is not available, and an employee crossing a public street to get to the parking lot is not protected." *Id.*

In other words, if the parking lot qualifies as an extended premises of the employer, then an injury occurring between it and the employer's actual premises is compensable. On the other hand, if the lot does not so qualify, then an injury occurring between the two premises is not compensable. Because I would find the lot in this case is not an extended premises, the injury occurring between it and the employer's actual premises should not be compensable.

In the case before us, employee apparently drove to work, parked in a privately-owned public garage, and walked two blocks to work. Under the majority opinion, he receives benefits. Another employee who (1) rode a Bi–State bus, (2) rode the Metrolink, or (3) car-pooled, and then walked the final two blocks to work would not receive benefits. *See e.g., Stockman v. J.C. Industries, Inc.,* 854 S.W.2d 24, 27 (Mo.App. W.D.1993) ("Generally, an employee may not recover workers' compensation for injuries sustained during travel to and from work.") The rationale for such a distinction escapes me.

In conclusion, I note that the exception stated in *Kunce,* which the majority relies on, is not satisfied by the facts before us. The *Kunce* test has two prongs. The first prong requires a finding that the premises is "owned or controlled by the employer" or is "appropriated" by the employer. The second

prong requires a finding that the injury occurred on *"that portion of such premises"* which is used to get to the employer's actual premises.

In the case before us, even if the lot was an extended premises of the employer, the employee was not on any portion of that extended premises when the injury occurred. Thus, the second prong of the *Kunce* exception is not satisfied.

I would affirm the Commission's decision.